# JACOBSON v. MARYLAND RACING COMMISSION

[No. 301, September Term, 1970.]

*Decided March 3, 1971.*

The cause was argued before HAMMOND, C. J., and BARNES, MCWILLIAMS, FINAN, SINGLEY, SMITH and DIGGES, JJ.

*George T. Tyler* for appellant.

*Jon F. Oster, Assistant Attorney General,* with whom was *Francis B. Burch, Attorney General,* on the brief, for appellee.

HAMMOND, C. J., delivered the opinion of the Court.

Howard Jacobson, licensed by the Maryland Racing Commission (the Commission) as an owner and as a trainer of race horses, claimed three horses—Shoeless Rebel, Wag Wag and Bar Tab—in claiming races at the Bowie race meeting that ended March 6, 1969 and within sixty days of their respective purchase, sold the horses in New York during the Aqueduct race meeting. The Stewards suspended Jacobson's licenses, relying on Rule 80 of the Maryland Rules of Racing (the Rules) which prohibits one who has claimed a horse in a claiming race in Maryland from selling it within sixty days of the date of claim.[1]

The Circuit Court of Baltimore City, Carter, J., ordered the Commission to reinstate the licenses and continue them in effect pending a hearing by the Commission. This was done. Jacobson filed a petition seeking (1) a declaration that the Rules did not apply to the charges brought against him (because the sales occurred in New York), and (2) an order that any action taken by the Commission after a hearing, adverse to him, be stayed, provided an appeal be taken within the time allowed by law. The Commission held a hearing at which most of the facts were stipulated and fined Jacobson $2,500 for violating Rule 80. Jacobson took an appeal from the Commission's order to the Baltimore City Court under the Administrative Procedure Act, Code (1965 Repl. Vol.), Art. 41, § 255. Judge Sodaro affirmed the Commission in the administrative appeal and dismissed the petition for the declaration and order, which had been consolidated with the appeal for the purpose of decision.

Jacobson contends that (a) the Rules "according to their express wording, are not applicable to events which

1. Rule 80 reads thus: "If a horse is claimed, it shall not be sold or transferred to any one wholly or in part, except in a claiming race, for a period of 60 days from the date of claim (the day of claim shall not count), nor shall it, unless reclaimed, remain in the same stable or under control or management of its former owner or trainer for a like period, nor shall it race elsewhere until after the close of the meeting at which it was claimed."

occur outside of Maryland and which have no connection with a Maryland race meet"; (b) the rule-making power and authority granted by the legislature does not permit the Commission to apply the Rules to events which occur outside of Maryland; and (c) the application of Rule 80 to events which occur outside of Maryland is violative of due process of law in two aspects — "the vagueness of Rule 80 with reference to its applicability outside of Maryland," and "the arbitrary and capricious application of the Rule to the facts * * *."

We agree with Judge Sodaro that these contentions must be rejected. Horse racing is an endeavor and undertaking that necessarily must be the subject of intensive, extensive and minute regulation. *Greenfeld v. Md. Jockey Club*, 190 Md. 96, 104-105. It exists only because it is financed by the receipts from controlled legalized gambling which must be kept as far above suspicion as possible, not only to sustain and profit the racing fraternity but to feed substantial, although by today's standards relatively few, millions to the State's revenues. Not surprisingly the legislature has given the Commission full power to control racing. Code (1969 Repl. Vol.), Art. 78B, § 1, provides that the Commission "shall be vested with and possessed of the powers and duties in this article specified and also the powers necessary or proper to enable it to carry out fully and effectually all the purposes of this article." Section 11 (a) says that the Commission "shall have full power to prescribe rules, regulations and conditions under which all horse races shall be conducted within the State of Maryland." This Court held in *Mahoney v. Byers*, 187 Md. 81, 84, that the Commission "has power and authority to promulgate reasonable rules to govern the racing of horses. It may make such rules regulating the conduct of trainers, jockeys, owners, and generally regulate all matters pertaining to horse [races], in order that they may be conducted fairly, decently and [cleanly] but may not revoke a license except for cause."

Faithful to the authorizing directives of the statutes

the Commission has promulgated several hundred rules. An owner may not race until licensed, Rule 234, and a trainer may not function until licensed, Rule 433. "Persons entering horses to run on licensed Maryland tracks agree in so doing to accept the decision of the Stewards on any question relating to a race or to racing," Rule 375. Claiming races are regulated. Rule 8 defines a "claiming race" as "one in which, according to the [specified] conditions [governing the race], any of the horses engaged may be claimed." Claiming races are provided for horses of varying values which, for the purposes of such races are in effect set by the owner. For example, there are $1,200 claiming races, $5,000 claiming races, $10,000 claiming races, and up to perhaps $30,000 claiming races. By entering his horse in a claiming race, the owner agrees that the "horse may be [bought] for its entered price by any owner registered in good faith for racing at that meeting, who has nominated a starter up to or including the race in which the claim is made * * *," Rule 69. "The claiming price of each horse in a claiming race shall be printed on the program, and all claims for said horse shall be for the amount so designated. Should more than one claim be filed for the same horse, the disposition of the horse shall be determined by lot under the direction and supervision of one or more of the Stewards of their designee," Rule 81.

J. F. Colwill, the Commission's Steward, testified at the hearing before the Commission as to claiming races and the history and purpose of Rule 80:

> "The purpose of claiming races is to have the owner and or trainer classify his horse rather than have the handicapper do so. If he runs a horse for a true price, therefore, he may lose his horse. If he sets too big a value on his horse, he will not win, and adjustment downward in price is indicated. A claiming race is not intended to be a sales ring in which a clever horseman or dealer can pick up a bargain and sell it at will.

> Therefore, there are certain protective restrictions; a horse cannot change ownership except by claim for sixty days, a horse cannot run at another track until the meeting in which he is claimed is terminated, agreements not to claim each other's horses and protective claims are barred, a claimant must be registered in good faith at the meeting and have nominated a starter at that meeting to be eligible to claim. These and others are designed to prevent — to preserve the intent of the claiming rule, to classify horses in what appears to be the most accurate and satisfactory manner."

Colwill also testified that some years ago horsemen would come into Maryland and claim "twenty-five, thirty, thirty-five, forty horses" and take them to other racing States and sell them. The Maryland horse breeders association became upset "because at that time Maryland was one of the few States that was racing in the winter time" and the Maryland horsemen found that:

> "some of their very best Maryland breds were being claimed and that they were being raided, that these horses were going out of our state which, in effect, would have some economic impact on racing in Maryland, because we were losing our better Maryland bred horses, and as you undoubtedly know, * * * the handle [the amount of money bet daily on the races at a meet] will vary with the quality of the horses that are run at the race meeting * * *."

As a result of the horsemen's concern, the Commission sent representatives to the Uniform Rules Committee of the National Association of State Racing Commissioners (of which Maryland is a member, supporting uniformity by the racing States in racing rules) and together with Kentucky, another great breeding State, asked to be relieved of the thirty-day "lockup" period after a claim in

order to substitute a sixty-day lockup period. The National Association agreed and the Commission amended Rule 80 to its present form.

Jacobsons' argument that the words of Rule 80 are inadequate to make it apply to sales outside of Maryland does not impress us. The proscription of the Rule is against any sale within sixty days. It is neither stated nor suggested that only sales in Maryland are barred. A main purpose of the Rule is to keep horses racing at the Maryland meeting at which they are claimed and this purpose would be frustrated if a horse could be sold outside of Maryland any minute after it was claimed in Maryland but could not be sold in Maryland under those circumstances for sixty days. In addition to barring sales within sixty days, Rule 80 provides that a claimed horse shall not "race elsewhere until after the close of the meeting at which it is claimed." The word "elsewhere" necessarily means a State other than Maryland because there is only one meet at a time in Maryland at which flat racers, as opposed to harness racers (trotters and pacers), run. Rule 80 undoubtedly is intended to bar a claimed horse from racing anywhere except at the Maryland meet at which it was claimed during the run of that meeting and, we have no doubt, to bar a sale of a claimed horse to anyone anywhere for sixty days.

Jacobson's argument that the legislature's delegations to the Commission of the power to regulate racing does not extend to the regulation imposed by Rule 80 approaches the frivolous, and we turn to his constitutional arguments.

The first is that Rule 80 "is vague, at least when given extraterritorial application," because a statutory prohibition, to be constitutional, must be "couched in plain and simple language which may be easily understood by persons of ordinary intelligence." It is clear to us that the words of Rule 80 that a horse claimed in Maryland shall not be sold or transferred "to anyone wholly or in part, except in a claiming race," for sixty days would convey to a person of ordinary intelligence that the claimed horse

could not be sold anywhere during that time. See *McGowan v. State,* 220 Md. 117, 125, aff'd *sub nom. McGowan v. Maryland,* 366 U. S. 420, 428-429, 6 L.Ed.2d 393, 400-401. One of the New York stewards named Potter told Jacobson that this was what the claiming rules were generally understood to mean—"a claiming rule followed the horse"—and Jacobson then attempted to rescind a sale and retake title to the horse.

Rule 89 not only indicates that Steward Potter was right but strengthens the other indications that Rule 80 was intended to and does have extra-territorial effect. Rule 89 provides that "[a]ll horses claimed in other States and racing here, shall be subject to the conditions of the claiming rule in the State where the claim was made."

The second thrust of the constitutional argument is that a State lacks the power to penalize an actor for an act done outside its territorial limits. Cited in support of this argument are *Owens v. State,* 10 Md. 164, in which an illegitimate child was both begotten and born in Pennsylvania and this Court held that the father could not be prosecuted in Maryland, and *Worthington v. State,* 58 Md. 403, 409, in which the Court said that where a person steals goods in another State and brings them into Maryland the person cannot be indicted and punished here for the crime committed in another State "for one State cannot enforce the criminal laws of another," but the act of bringing the stolen goods into Maryland was "a new larceny" for which the thief could be indicted and punished in Maryland.

The constitutional limitation which the appellant invokes to keep Maryland from disciplining him stems from the lack of a nexus between the actor and what he has done and the State which seeks to punish him. In the case before us, there was ample connection between Jacobson and Maryland. He could not race in Maryland without being licensed to do so and he could not become licensed without becoming bound by the Commission's reasonable rules of racing. When Jacobson proceeded to acquire horses in Maryland by exercising rights conferred by the

claiming rules, he was bound by Rule 80 not to sell a horse he so acquired within sixty days and the Commission therefore had the power and right to punish him for violating the rule he was bound by, even though the violation occurred outside Maryland.

It has long been recognized that in various contexts acts done outside a jurisdiction which produce detrimental effects within it justify a State in punishing him who caused the harm as if he had been present at the place of its effect. See *Restatement of Conflict of Laws* §§ 64 and 65. In *United States v. Pizzarusso* (2d Cir.), 388 F. 2d 8, 10, Judge Medina, for the Court, pointed out that while courts often have been reluctant to ascribe extraterritorial effect to statutes:

> "Nonetheless, our courts have developed what has come to be termed the objective territorial principle as a means of expanding the power to control activities detrimental to the state. This principle has been aptly defined by Mr. Justice Holmes in *Strassheim v. Daily,* 221 U. S. 280, 285, 31 S. Ct. 558, 560, 55 L. Ed. 735 (1911). 'Acts done outside a jurisdiction, but intended to produce and producing detrimental effects within it, justify a state in punishing the cause of the harm as if he had been present at the effect * * *.' See also Judge Learned Hand's opinion in *United States v. Aluminum Co. of America,* 148 F. 2d 416 (2d Cir. 1945). Underlying this principle is the theory that the 'detrimental effects' constitute an element of the offense and since they occur within the country, jurisdiction is properly invoked under the territorial principle. See also Restatement (Second), Foreign Relations Law Section 18."

See also *Schoenbaum v. Firstbrook,* 405 F. 2d 200, 208.

In *Strassheim v. Daily,* 221 U. S. 280, 285, 55 L. Ed. 735, 738, Mr. Justice Holmes, in addition to what Judge Medina quoted in *Pizzarusso,* said:

> "On the other hand, however, we think it plain that the criminal need not do within the State every act necessary to complete the crime. If he does there an overt act which is and is intended to be a material step towards accomplishing the crime, and then absents himself from the State and does the rest elsewhere, he becomes a fugitive from justice, when the crime is complete, if not before."

In another aspect of the right to proscribe extra-territorial behavior, the Supreme Court (Stone, C. J.), in upholding a Florida statute forbidding the use of diving gear in the commercial taking of sponges, said in *Skiriotes v. Florida,* 313 U. S. 69, 76, 85 L. Ed. 1193, 1200:

> "Even if it were assumed that the *locus* of the offense was outside the territorial waters of Florida, it would not follow that the State could not prohibit its own citizens from the use of the described divers' equipment at that place."

In *United States v. Aluminum Co. of America* (2d Cir.), 148 F. 2d 416, 443 (cited by Judge Medina in *Pizzarusso, supra*), Judge Learned Hand said it was settled law "that any state may impose liabilities, even upon persons not within its allegiance, for conduct outside its borders that has consequences within its borders which the State reprehends * * *." This Court in *Donigan v. Donigan,* 208 Md. 511, 522, ruled that:

> "It is generally held that, by virtue of its power over a person properly before it, a court of equity may compel him to act in relation to property not within the jurisdiction * * *, but that its decrees do not operate directly on the property nor affect the title, but are only made effectual by directing some action on his part, such as the execution of conveyances or the execution or cancellation of other instruments or writings. * * * In *Fall v. Eastin,* 215 U. S. 1,

54 L. Ed. 65, 69, the court referred to language of *French v. Hay* (*French v. Stewart*), 22 Wallace 250-2, 22 L. Ed. 857, 858, that a court of equity, having jurisdiction *in personam*, has power to require a defendant '* * * "to do or to refrain from doing anything beyond the limits of its territorial jurisdiction which it might have required to be done or omitted within the limits of such territory." ' "

We think that Jacobson had become a racing citizen of Maryland as far as the purposes and effects of the Rules are concerned and that this State acquired sufficient personal jurisdiction over him in matters of licensed racing to permit it to enjoin him by Rule 80 from selling a horse claimed in a licensed Maryland race for sixty days, and to punish him if he disobeyed that rule.

*Orders affirmed, with costs.*