640 A.2d 259

Frank P. LUSSIER

v.

MARYLAND RACING COMMISSION.

No. 1461, Sept. Term, 1993.

Court of Special Appeals of Maryland.

April 29, 1994.

Glenn E. Bushel (Brocato, Price & Bushel, P.A., on the brief), Baltimore, for appellant.

Bruce C. Spizler, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., on the brief), Baltimore, for appellee.

Before WILNER, C.J., and MOTZ and MURPHY, JJ.

MOTZ, Judge.

This case involves a claim by a racehorse owner that the Maryland Racing Commission improperly fined him for violations of its regulations.

(i)

In April, 1991, appellant Frank P. Lussier, a Vermont resident and owner of several automobile dealerships, purchased three two-year-old thoroughbred racehorses at the Ocala Breeders' Sale. Lussier's reason for buying the horses was, in his words, "to make some money with these horses." As he explained, "my contention was take these horses and I want to bet these horses and I want to make some money with these horses. I'm not in this for nothing." He further explained that, since he knew little about horses, he hired Michael Downing, a New England trainer, with what another witness characterized as a "very good reputation in the racing community," to train the horses. The agreement between Lussier and Downing was that Downing would be responsible for all bills related to training and maintaining the horses and would receive sixty percent of the horses' earnings, while Lussier, who had purchased the horses, would receive only forty percent of those earnings.

On September 6, 1991, the three horses purchased by Lussier at Ocala—Perfect Reign, The Manager, and High Passer—were tattooed for identification purposes at Rockingham Park in Salem, New Hampshire. The tatoo branding

report for each horse listed their owner as Capital Racing Stable, the stable name used by Lussier, and their trainer as Michael Downing. Less than three months later, during a single five week period, each of the horses was shipped from New Hampshire to Laurel Race Course in Maryland to race in separate $12,000 claiming races for two-year-old maidens.[1] Shortly thereafter, beginning in February, 1992, appellee, the Maryland Racing Commission and the Thoroughbred Racing Protective Bureau engaged in a joint investigation to determine whether during the Maryland races the true owner or trainer of the horses had been concealed and whether falsified workout reports for the horses had been published. That investigation led to a Commission hearing in which there was evidence as to the following facts.

Perfect Reign raced at Laurel on November 26, 1991. Six days earlier in New Hampshire, Michael Downing (Lussier's trainer) had approached Woodard Tuttle, a hot walker, groom, and trainer, and asked if Tuttle would be interested in buying a young horse. Downing told Tuttle that the horse had a "little ability" and "might last 20 starts [or] . . . a couple starts." Tuttle agreed to purchase the horse for $5,000 and purportedly gave Downing $5,000 in cash. Although Lussier himself did not negotiate the sale price, he testified that he had authorized the sale of Perfect Reign because Michael Downing had told him that the horse had problems and so Downing thought he could only "get a race, maybe two, out of the horse." When Perfect Reign arrived at Laurel, Tuttle was listed as the owner and trainer on the entry form; Tuttle was also listed as Perfect Reign's owner and trainer in the *Daily Racing Form* and the track program published on the day of the race. Tuttle applied for and was granted an owner and trainer license; the license application asked Tuttle "to list all

---

1. A claiming race is one in which a licensed owner may claim, *i.e.*, purchase, a horse before the running of the race for the amount of the claiming price. COMAR .09.10.01.01B(7); COMAR 09.10.01.07A. A maiden is a horse that has never won a race. Once a horse wins a race, it is no longer deemed a maiden and can no longer compete against other maidens. COMAR 09.10.01.01B(13).

horses owned by you, wholly or in part" and Tuttle listed only Perfect Reign.

Because Perfect Reign had never raced before, there were no performance times from previous races available to be printed in the *Daily Racing Form* or the track program. Instead, as permitted by the regulations (COMAR 09.10.01.-19YY), the horse's purported workout results were printed. The results attributed to Perfect Reign were for workouts at Delaware Park on October 29, 1991, November 6, 1991, and November 18, 1991. The *Daily Racing Form*'s sole clocker at Delaware Park, however, told an investigator that he had no knowledge of these workouts (or of the workouts of The Manager or High Passer described within). The clocker said that it had become his practice to accept workout information given to him at the track even though he knew that the information was often false.[2]

On the day of Perfect Reign's race, even though they assertedly no longer had any owner or trainer relationship with the horse, Lussier and Michael Downing were present at Laurel. Lussier bet heavily (approximately $5,400) on Perfect Reign; he bet $1,200 to win, place, or show and, in addition, "wheeled the horses back and forth in all the exactas." (Thus, he bet Perfect Reign to win in combination with each of the other horses in the race to finish second.). This betting had an effect on the odds, which opened at 30–1 and closed at 15–1. The Racing Commission asked Lussier why he had bet $5,400 on a horse that he had sold because his trainer had told him that the horse "had maybe one or two races [left]" and "wasn't in such good shape." Lussier responded that it was because "I needed to get out [*i.e.*, get the return of his purchase money for the horse]." Lussier explained that he expected to do this because,

---

**2.** The clocker said that a 40–year–old white male calling himself "John" gave him the information on Perfect Reign, The Manager, and High Passer. The investigator showed him a group photograph of Lussier, Downing, and Tuttle; the clocker could not identify any of them as "John."

A. ... I got the horse in a race that if she didn't fall down she was going to win. That was the way it was presented to me. But if you see the film you'll maybe understand.

Q. Oh, the horse won by eight lengths.

A. Okay. Right.

Q. With no workouts that show anything of value.

A. You know, exactly. I know nothing about those workouts and that's the true. [sic]

After this exchange, a racing commissioner asked:

Q. I'm really puzzled ... you were told by the trainer that the horse was really—maybe had a race or two in him, was lame and you sold the horse before the race. I don't think—if you thought the horse had a couple good races in it, I don't know why you would sell the horse and then you bet $5400 on him.

Lussier's only response to this question was to point out that he had volunteered that he had bet on Perfect Reign and that "[t]he only horse they had me on was The Manager, the bet." (In fact, that is not entirely accurate; a mutuel clerk at Laurel identified Lussier from a photograph as the person who bet wheeling exactas on Perfect Reign.).

Perfect Reign won the race at Laurel and Lussier collected more than $15,000 in winnings. Although Tuttle was listed as the owner and trainer, in the photograph of Perfect Reign in the winner's circle, Tuttle stood off to the side while Lussier appeared prominently in the center of the winner's circle. Immediately after the race, Michael Downing approached Tuttle and said that Lussier had demanded that he repurchase Perfect Reign. Lussier testified that when Perfect Reign won the race, he thought he might have been tricked ("[t]he horse business is a tricky business"), and he "want[ed] that horse back." Tuttle agreed to sell the horse back to Lussier assertedly because Perfect Reign's ankle was a bit swollen and she was not "cooling out" well.

Tuttle testified that it was then agreed that he would be paid $6,000 for a horse that had just won Lussier $15,000.

Although Tuttle told investigators that the bills of sale were on file at Rockingham evidencing the sale and resale of Perfect Reign, their investigation revealed that no such bills of sale were on file. At the Commission hearing, Tuttle's attorney did have admitted into evidence bills of sale evidencing the sale and resale. The document evidencing the resale of the horse to Lussier from Tuttle, is dated December 20, 1991, almost a month after the date of the Maryland race and Tuttle's oral agreement to resell the horse.

When Perfect Reign next raced, at Aqueduct in New York on January 5, 1992, Lussier was listed as the owner and Michael Downing as the trainer; in this $27,000 allowance race, the horse finished third.

The second horse, The Manager, raced at Laurel on December 29, 1991. Three days earlier on December 26, Lussier had asked Jody Marsh, a groom employed by Michael Downing and whom Lussier had only known for a few months, if she would like to train The Manager for the race. Lussier testified that he asked Marsh to train the horse because Michael Downing would be out of the country in Venezuela on a prepaid vacation at the time of the Maryland race. Marsh agreed to train The Manager without ever discussing with Lussier her salary or any other compensation for her services. Indeed, Marsh testified that she did not know where The Manager was stabled, had never seen the horse work out, and did not know about any prior workouts or even whether the horse was fast or slow. According to Marsh, all she knew when she agreed to train The Manager was that the horse was "a two year old filly, first time starter, and that was about it."

The Manager was shipped to Laurel on December 26, 1991, with Michael Downing listed on the horse transportation company's records as the person responsible for the payment of transportation costs. Marsh did not arrive at Laurel until December 28. At that time, she applied for an original trainer's license in which she indicated that she was not licensed as a trainer in any other jurisdiction. Marsh testified that she "took care of [The Manager], got her to the race

track, took care of her, fed her." She did not gallop the horse herself, see the horse work out, or provide racing instructions to the jockey, all of which are the usual duties of a trainer. Marsh explained that she was accompanied at Laurel by Michael Downing's brother, William ("Radio") Downing, who "knew the horse a little better than me," and Radio told the jockey "a little bit about the horse."

Marsh (not Michael or Radio Downing) was listed in the *Daily Racing Form* and on the track program as The Manager's trainer and Lussier, who had obtained a Maryland owner's license from the Racing Commission on December 29, was listed as the horse's owner. Like Perfect Reign, The Manager had never raced before, and so her workout, rather than prior race, results were printed in the *Daily Racing Form* and the track program. Again, these workouts purportedly took place at Delaware Park, although, in fact, Michael Downing told an investigator, that "The Manager had never worked [out] at Delaware Park." When contacted by the investigator, the Delaware Park clocker stated that the workouts were really those for The Manager's dam, Fairy Isle, and were transferred to The Manager "at another level with[in]" the *Daily Racing Form;* the clocker "did not know how" this was done, but it was being investigated.

As he had with Perfect Reign, Lussier bet heavily (he said approximately $6,000) on The Manager and the odds fell from 20–1 to 4–1. Like Perfect Reign, The Manager won the race easily—by three lengths. Lussier again collected winnings in excess of $15,000. Michael Downing, who according to Lussier was supposed to have been on vacation out of the country during the race, was, in fact, present at Laurel and bet $500 himself on The Manager. Immediately after the race, while standing with Marsh in the winner's circle at the track, Lussier told Marsh that "he was giving the horse[ ] back to Mike [Downing]." Lussier did not pay Marsh the usual trainer's percentage of the purse monies earned by the horse; his only payment to her for training the horse was $200, given with the advice to "go out and have fun." Instead, Lussier paid the entire trainer's percentage share of the Laurel purse

monies to Michael Downing. After the race, Marsh went back to New England and worked as a groom for Michael Downing; she stated that she has never again been hired to train a horse.

An investigator testified that Marsh told him that when she saw the odds suddenly drop she knew she had been used and that she confronted Lussier about his bets; he showed her a handful of tickets and said he had bet $7000. At the hearing before the Commission, however, Marsh testified that although she saw the odds suddenly drop and so "observed somebody must have liked her [The Manager] and bet a lot," she did not speak with Lussier about his betting. An investigator also testified that Michael Downing said Lussier "bet a bundle on The Manager." During the drive back to New Hampshire after the Laurel races, Downing purportedly told Lussier that "someone might notice the large bets made on the horse but as the weeks passed both he and Lussier felt that they were pretty safe." Lussier did not directly deny this conversation, but did testify that he flew directly from Dulles Airport to Florida after the Laurel races on December 31.

The Manager next raced at Suffolk Downs in Massachusetts on January 25, 1992; Lussier was the listed owner and Downing the trainer. The horse won this $10,000 allowance race by 4¾ lengths.

The third horse, High Passer, raced at Laurel on December 31, 1991; the horse was shipped to Laurel from New England with The Manager on December 26. On that same day or the next, Radio Downing asked Carlisle Wisecarver, an outrider at the Laurel Race Course, if he would like to purchase High Passer. Radio told Wisecarver that the horse might have a problem with his left knee. Wisecarver galloped High Passer and then met for the first time with Lussier the next day. They orally agreed that Wisecarver would buy High Passer for $10,000; there was no down payment, rather the entire purchase price was to be paid in monthly installments of $1,000 per month beginning at the end of January, 1992. In

addition, it was agreed that because of the horse's possible left knee problem, Wisecarver could cancel the deal after High Passer raced. Although Lussier assertedly signed the foal paper on High Passer over to Wisecarver, no written agreement, bill of sale, or loan documents evidencing this transaction were signed or even prepared. On his application for licensure, Wisecarver indicated that High Passer was the only horse owned by him. When High Passer raced, Wisecarver was listed in the *Daily Racing Form* and the track program as the horse's owner and trainer.

Once again, workout rather than race times were published for High Passer because this was the horse's first race. Again, the workout results were from Delaware Park, although High Passer had never worked out there; in fact, on one of the purported workout dates (December 28, 1991), High Passer was already at the Laurel Racecourse. Again, although Lussier purportedly had no ownership interest in High Passer, he was present at Laurel for the horse's race and, he testified, made bets on High Passer, similar to those made on Perfect Reign and The Manager. Because High Passer finished third, one length behind the winner, Lussier did not cash any of his tickets. Wisecarver collected the third place purse money of $730.

During the race High Passer was assertedly injured because of being "clipped" on the right leg (not the left leg, on which there was an alleged pre-race problem). Because of this injury and because the horse was not "cooling out well" Wisecarver rescinded the sale and Lussier agreed to take back the horse.

When High Passer next raced at Philadelphia Park on February 2, Lussier's stable was listed as the owner and Downing as the trainer; the horse finished fifth. A few months later the horse finished first.

Both Lussier and the Commission subpoenaed Michael Downing to testify at the Racing Commission hearing; he did not respond to the subpoena. At the time of the hearing, Downing was still Lussier's trainer for two horses; neverthe-

less, Lussier conceded that he did not personally request that Downing attend the hearing, nor did he even talk with Downing in the two weeks prior to the Racing Commission hearing. In an informal interview, Downing told an investigator that he was "concerned with the aftermath of what could happen if he did agree to be interviewed [formally] and told the 'whole' story as to how the false works [sic] appeared in Delaware and how easy this type of thing could happen and is happening every day across the country going unnoticed." He told the investigator falsified workouts "happen" frequently and easily. He explained, " 'Big scores,' . . . are common, especially when nobody checks to see if the horse presented to the clocker is really the 'right' horse."

Eight witnesses testified at the Racing Commission hearing on this matter. Among these witnesses, in addition to two investigators, were Lussier, Marsh, Tuttle, and Wisecarver, all of whom were charged with violations of Racing Commission regulations. The hearing transcript exceeds 600 pages; the Commission also considered numerous exhibits. The Commission found that Lussier "directly, or through his agents," (1) "ostensibly" sold Perfect Reign to Tuttle "in order to effectively conceal the identity of the true owner and trainer of the horse"; (2) had Marsh "pose as the trainer of 'The Manager' . . . in order to effectively conceal the identity of the true trainer"; (3) "ostensibly" sold High Passer to Wisecarver "to effectively conceal the identity of the true owner and trainer of the horse"; (4) "effectuated the publication of three falsified mediocre workouts" for each horse "shortly before each horse raced in Maryland"; and (5) after "[h]aving effectively concealed . . . the true identity" of the owner of Perfect Reign and High Passer and the trainer of all three horses and "having effectively misinformed the betting public as to the true speed of these horses . . . wagered large sums of money on each horse" and collected winnings in excess of $30,000.

A majority of the Commission sustained all but one of the charges against Lussier and none of the charges against the others. Specifically, the Commission concluded that Lussier had: participated in improper acts in relation to racing in

violation of COMAR .09.10.01.11(A)(3); transferred Perfect Reign and High Passer from himself to the name of another person for a purpose other than the legitimate sale of a horse in violation of COMAR .09.10.01.11(A)(14); and perpetrated dishonest acts in connection with his activities, responsibilities, and duties on the race track, and engaged in conduct detrimental to racing in violation of COMAR .09.10.01.25(B)(8). The Commission penalized Lussier by ordering him to pay a fine of $5,000. Lussier appealed to the Circuit Court for Baltimore County, which, after conducting a hearing, affirmed the decision of the Commission in an opinion and order dated July 12, 1993.

Appellant presents four questions for our review:

1. In the absence of statutory authorization to do so, may the Maryland Racing Commission "fine" licensed horse owners?

2. Did the Maryland Racing Commission effectively charge the appellant with wrongdoing, and were the Commission's principal factual and legal conclusions supported by competent, material, and substantial evidence, in light of the applicable burdens of proof?

3. Were the COMAR provisions invoked against the appellant unconstitutionally vague, and therefore void?

4. May the Stewards or the Maryland Racing Commission subpoena individuals beyond Maryland's borders?

(ii)

■ Lussier maintains that the Commission is "without statutory authority to 'fine' licensed horse owners" because there is no express authority to fine in the statute creating and empowering the Commission. An administrative agency is, of course, a "creature of statute, [which] has no inherent powers and its authority thus does not reach beyond the warrant provided it by statute." *Holy Cross Hosp. of Silver Spring, Inc. v. Health Servs. Cost Review Comm'n,* 283 Md. 677, 683, 393 A.2d 181 (1978). The power to impose penalties belongs to the legislature; however, the legislature may dele-

gate that power to an agency. *County Council v. Investors Funding Corp.*, 270 Md. 403, 441, 312 A.2d 225 (1973).

■ The cases upon which Lussier relies, *Eastern Diversified Properties, Inc. v. Montgomery County*, 319 Md. 45, 570 A.2d 850 (1990); *Holy Cross Hosp.; Gutwein v. Easton Publishing Co.*, 272 Md. 563, 325 A.2d 740 (1974), *cert. denied*, 420 U.S. 991, 95 S.Ct. 1427, 43 L.Ed.2d 673 (1975) and *Wielepski v. Harford County*, 98 Md.App. 721, 635 A.2d 43 (1994), do not support his theory that an agency can impose civil penalties only when its enabling statute expressly so provides. Indeed, none of these cases even involves civil penalties. *Holy Cross Hosp.* held that an agency could not regulate the fees charged by certain medical specialists under the agency's authority to set rates for hospital costs. 283 Md. at 679, 393 A.2d 181. *Eastern Diversified* and *Wielepski* determined that a county's attempt to impose certain fees were actually the imposition of general taxes in violation of the State Constitution. *Eastern Diversified*, 319 Md. at 55, 570 A.2d 850; *Wielepski*, 98 Md.App. at 731, 635 A.2d 43. *Gutwein* held that the Human Relations Commission did not have authority to order an employer to pay an employee compensatory damages. 272 Md. at 576–77, 325 A.2d 740.

■ Moreover, in none of these cases did the courts hold that unless the General Assembly expressly grants an agency a power, the agency does not have this power. Not even in the case on which Lussier most strongly relies, *Gutwein*, did the court so hold. The *Gutwein* court did, of course, note that although the enabling statute gave the Human Rights Commission broad powers to take "affirmative action as will effectuate the purposes of the particular subtitle," it did not expressly grant the agency the power to order money damages. 272 Md. at 568, 576–77, 325 A.2d 740. The *Gutwein* court, however, seemed to give far more weight to the limited purpose of the statute, the restricted way in which the statutory language in similar statutes had been interpreted in other jurisdictions, and the fact that that statute's legislative history indicated that the General Assembly intended that the Human

Relations Commission have only very limited enforcement powers. *Id.* at 568–76, 325 A.2d 740. Thus, the statute's failure to provide express authorization for the payment of money damages was not, in and of itself, even dispositive on that issue. In *Holy Cross Hosp., Eastern Diversified,* and *Wielepski,* the courts engaged in similar analyses in determining whether an agency had the challenged power. Hence, all these cases indicate that whether a power to impose a certain penalty is expressly conferred upon an agency is not determinative of whether an agency has such power. Rather, a court must examine the purpose of the statute creating the agency, its legislative history, and any relevant case law to determine whether the legislature intended that the agency have the challenged authority. *See Eastern Diversified,* 319 Md. at 49–55, 570 A.2d 850; *Holy Cross Hosp.,* 283 Md. at 685–90, 393 A.2d 181; *Gutwein,* 272 Md. at 568–77, 325 A.2d 740; *Wielepski,* 98 Md.App. at 726–31, 635 A.2d 43. Accordingly, we turn to that examination.

The General Assembly first enacted legislation establishing State control over horseracing in 1920. Division of Fiscal Research, Maryland General Assembly, Maryland Horseracing Historical Overview 1 (1989); *see also* 1920 Md.Laws, chap. 273.[3] There were two objectives to this statute: the regulating of horseracing and the raising of revenue. *See* 6 Opp. Att'y Gen. 480 (1921); *see also* Commission to Study the Racing Laws of the State of Maryland, First Report 1–2 (1946). The legislature dealt with the latter goal in some detail, but it said very little about the regulation of racing. 6 Opp. Att'y Gen. at 480. Thus, although the original statute (as well as the current Act), specifically discusses the regulation of those who hold racing events, it provides little in the way of

---

**3.** Until 1992, the statutes governing horseracing were codified in Article 78B of the Maryland Code. In 1992, Article 78B was repealed and its provisions reenacted at Md.Code (1992), §§ 11–101 to 11–1102 of the Business Regulations Article. References throughout are to the current statute which is referred to herein as the Act; the relevant sections were derived without substantive change from Article 78B and, unless specifically noted to the contrary, were part of the statute as originally enacted.

regulation of jockeys, trainers, and owners. *Id.* For example, the Act expressly provides the Commission with the power to license, deny a license, suspend or revoke a license, or impose monetary penalties on those holding "race meetings," *see* § 11–101(g) and (h) and § 11–308, but provides the Commission with no express power to license, deny a license, suspend or revoke a license, or impose monetary penalties on jockeys, trainers, and owners.

The Act does, however, grant the Racing Commission broad general powers to regulate horse racing and betting:

### § 11–209 General powers of Commission

(a) *In general.*—Besides its powers under this title, the Commission has the powers necessary or proper to carry out fully all the purposes of this title.

### § 11–210 Regulatory power of Commission

(a) *In general.*—Except as provided in subsection (b) of this section, the Commission may:

(1) adopt regulations and conditions to govern racing and betting on racing in this State

Furthermore, the Act expressly prohibits the Commission from adopting certain regulations; regulations permitting the Commission to fine or penalize owners are not among the regulations expressly prohibited. *See* § 11–210(b).

From the very beginning, questions arose as to the ability of the Commission to regulate persons other than those who hold the race meetings. In 1921, the Attorney General was asked whether the above quoted general powers permitted the Commission to require that jockeys and trainers be licensed. 6 Opp. Att'y Gen. at 480. In concluding that licensing of jockeys and trainers was within the scope of authority granted the Commission, the Attorney General specifically recognized that "no control over them [was] given the Commission by any express provision in the [Act]," *id.* at 481, and that very few of the Commission's express statutory powers dealt with "the regulation of racing itself." *Id.* at 480. The Attorney General noted that the reason for this was that the legislature "realized that the formulation of adequate, practical and satisfacto-

ry regulations [governing those involved in racing itself] involved a knowledge of racing conditions which the General Assembly did not possess, and which could only be acquired by a careful study of racing, and of the many problems connected therewith." *Id.*

The Attorney General, citing to the statutory predecessors of §§ 11–209 and 11–210, concluded that even though the Commission was given no express statutory control over, let alone power to license, jockeys and trainers, the General Assembly intended that it have this power. He reasoned:

> There can be no full and complete control of racing on the part of the Commission, unless it controls those upon whose skill and honesty the outcome of the race so largely depends. All other regulations, rules and conditions prescribed by the Commission for the purpose of securing clean racing and elevating the standards by which racing is to be conducted in Maryland could be nullified by dishonest and purchasable jockeys and trainers.... I do not believe, ... that the Legislature intended that jockeys and trainers, whose probity is so essential a feature of clean racing, should be entirely beyond the control of the Commission.... [The Act was] clearly designed to give the Commission *broad and sweeping powers of control and regulation of racing,* and I am of the opinion that, in spite of the [limited] authorization expressly conferred therein, the Commission possess *practically unlimited power to pass, promulgate and enforce* such rules and regulations actually dealing with the control of racing as in the judgment of the Commission appear to be desirable and necessary.

*Id.* at 481–82 (emphasis added). Thus, since the General Assembly had given the Commission "full power" to regulate horseracing, the Attorney General found that the Commission could not do so without the ability to "full[ly] and complete[ly]" control "those upon whose honesty and skill the outcome of races depended." *Id.* 480–81.

In 1946, the Court of Appeals settled many of the questions regarding the scope of the Commission's power when it held

that the Commission's statutory authority to regulate included the power to make rules "regulating the conduct of trainers, jockeys, owners, and generally regulate all matters pertaining to horse racing, in order that they may be conducted fairly, decently and cleanly but may not revoke a license except for cause." *Mahoney v. Byers,* 187 Md. 81, 84, 48 A.2d 600 (1946). *See also* Commission to Study the Racing Laws of the State of Maryland, Final Report 2 (1946). Although the appellate courts of this State have never addressed the precise question raised here, *i.e.,* the authority of the Commission to impose fines on licensed owners,[4] they have repeatedly recognized and reiterated the broad powers conferred on the Racing Commission. *See Heft v. Maryland Racing Comm'n,* 323 Md. 257, 263–64, 592 A.2d 1110 (1991); *Silbert v. Ramsey,* 301 Md. 96, 105, 482 A.2d 147 (1984); *Jacobson v. Maryland Racing Comm'n,* 261 Md. 180, 183, 274 A.2d 102 (1971); *Greenfeld v. Maryland Jockey Club,* 190 Md. 96, 104, 57 A.2d 335 (1948); *Brann v. Mahoney,* 187 Md. 89, 102–03, 48 A.2d 605 (1946); *Mules v. Maryland Racing Comm'n,* 30 Md.App. 533, 546, 353 A.2d 664, *cert. denied,* 278 Md. 729 (1976). *See also Lemberos v. Laurel Racecourse, Inc.,* 489 F.Supp. 1376, 1389 (D.Md. 1980) (holding that Commission's regulations delegating broad power to the stewards, including the power to fine, to be reasonable and consistent with the purposes of the Maryland statutes regulating horse racing).

Moreover, in one of these cases, *Jacobson v. Maryland Racing Comm'n.,* the Commission had imposed a $2500 fine on Mr. Jacobson, a horse owner and trainer. As Lussier points out, Mr. Jacobson specifically did *not* "appeal from that part of" the Commission order finding that he had violated a regulation and imposing a "money fine." *See* Record Extract at 12, *Jacobson v. Maryland Racing Comm'n.* Accordingly, there is no holding on this issue. Interestingly, however, there is no question in the opinion as to the imposition of the

---

4. Nor have the parties cited or we been able to uncover any out-of-state case law determining whether a racing commission's broad general powers provide it with the ability to impose civil fines.

fine, although the Court of Appeals often does question an action of a lower court or agency with which it disagrees, even when that action has not been appealed or, for some other reason, is not directly before it. *See, e.g., County Council v. Maryland Reclamation Assocs.*, 328 Md. 229, 236, 614 A.2d 78 (1992); *Marchesi v. Franchino*, 283 Md. 131, 133–34 n. 2, 387 A.2d 1129 (1978). Instead, in *Jacobson*, Chief Judge Hammond specifically noted for the unanimous court:

Horse racing is an endeavor and undertaking that necessarily *must be the subject of intensive, extensive and minute regulation.* It exists only because it is financed by the receipts from controlled legalized gambling which must be kept as far above suspicion as possible.... Not surprisingly *the legislature has given the Commission full power to control racing.*

261 Md. at 183, 274 A.2d 102 (internal citation omitted) (emphasis added).

The Attorney General has similarly never opined as to the precise question raised here. Nevertheless, like the courts, he has continued to recognize and reiterate the Commission's broad powers in other contexts, provided it acts pursuant to duly promulgated regulations. *See, e.g.,* 72 Op. Att'y Gen. 313 (1987) (power to permit Arabian racing); 65 Op. Att'y Gen. 396 (1980) (power to permit racing on Sunday); 39 Opp. Att'y Gen. 250 (1954) (power to license grooms).

It is undisputed that the Racing Commission has properly promulgated regulations that specifically authorize the imposition of a fine of the sort challenged here. After requiring general licensees, *e.g.,* owners, trainers, jockeys, grooms, and numerous other track employees, to obtain annual licenses in order to participate in races in this State, COMAR 09.10.01.-25A, the regulations further provide:

(1) The Commission may deny a license to an applicant and may suspend or revoke a license if an applicant or licensee has violated an applicable provision of law, any regulation adopted by the Commission, or any condition imposed by the Commission.

(2) Instead of, or in addition to, suspending a license, the *Commission may impose a fine not exceeding $5,000.* COMAR 09.10.01.10H. (emphasis added).

Furthermore, a regulation permitting the Commission or racing stewards to impose fines on general licensees is hardly a recent development. Although regulation .10H in its current form only became effective in March, 1992, the Commission's rules and regulations have long permitted the Commission to impose fines on general licensees.[5] At least as early as 1938, the Rules of Racing permitted the stewards to impose a fine of up to $200 on an owner, trainer, jockey, groom or "other persons attendant on horses." 1938 Rules of Racing, Rules 23, 26. If the stewards believed that the fine was insufficient they were to "so report to the Commission." *Id.* Rule 26; *see also* 1947 Rules of Racing, Rule 25; 1954 Rules of Racing, Rule 364; 1962 Rules of Racing, Rule 365 (stating that if further punishment or additional fine are necessary, the stewards "shall promptly refer the matter to the Commission."); 1967 Rules of Racing, Rule 369. The Rules also permitted the Commission, when punishing violations of the corrupt practices rules "to rule off or suspend" any violators, including owners, "or impose other such penalties as in its judgment shall be appropriate and proper under the circumstances." *See, e.g.,* 1954 Rules of Racing, Rule 116. Thus, since at least 1938, the Commission's rules or regulations have permitted the Commission and its stewards to impose fines on general licensees. During that time, the General Assembly has had occasion to amend the statute empowering the Racing Commission 174 times in 46 different years;[6] the legislature has never seen fit to deprive the Commission of the power to fine general licensees.

---

**5.** *In adopting regulation .10H in 1992, the Commission stated that its purpose was to delineate the criteria to be used in assessing a fine and to establish the maximum penalty at $5,000.* 19:5 Md.Reg. 575 (Mar. 6, 1992); 18:24 Md.Reg. 2660–61 (Nov. 29, 1991).

**6.** *See* Md.Code (1957, 1991 Repl. vol., 1993 Cum.Supp.), Art. 78B §§ 1–32; Md.Code (1992, 1993 Cum.Supp.), § 11–101 to 11–1102 of the Business Regulations Article.

Moreover, there is substantial affirmative evidence of legislative recognition and implicit approval of the Racing Commission's power to impose fines on general licensees. In 1947 the General Assembly enacted a statute that authorized the establishment of the Relief Fund of the Maryland Racing Commission, which was to be funded by "all fines, penalties, etc." and to be used to benefit stable attendants and others who became ill or were injured in the performance of their duties at race tracks. 1947 Md.Laws, chap. 786, now codified as § 11–909 of the Business Regulations Article. Since 1921, the Commission itself had operated such a fund, the Board of Relief–Maryland Racing Association. 1947 Md.Laws, chap. 786. Concerns about the legality of using this informal arrangement prompted the General Assembly to enact the 1947 legislation. In doing so, the General Assembly expressly noted that *"for many years* [the Commission] paid over to [the] Board of Relief *all fines collected from jockeys, trainers, owners and others* and overpayment on the tote machines for the purpose *of furnishing such welfare benefits."* Preamble to 1947 Md. Laws, chap. 786 (emphasis added). The stated purpose of the 1947 Act was to "authoriz[e] the ... Commission to disburse funds ... held by it in the name of the Board of Relief ... and certain *fines and penalties hereafter collected from jockeys, trainers, owners and others* and overpayment on the tote machines...." *Id.* (emphasis added). Therefore, although the 1947 legislation (and the present Act) refer only to "all fines and penalties and over-payment on the tote machines, except such fines and penalties as may be imposed upon Associations," *id.* § 1; § 11–909 (replacing "Associations" with "licensees"), the General Assembly, when it enacted this provision, clearly knew—and implicitly approved—the fact that the source of some of the Racing Commission funds and all of those funds that were "fines," were indeed fines collected from general licensees, *e.g.,* owners.

Furthermore, the Sunset Review of the Maryland Racing Commission (Sunset Report), prepared in 1989 for the General Assembly by the Department of Fiscal Services, indicates that the Commission's imposition of fines on general licensees was

specifically brought to the General Assembly's attention. In the Sunset Report, the Department of Fiscal Services first discussed those fines for which there is specific statutory authorization, *i.e.*, those imposed on race course owners. It noted that approval of racing days, once an "important function[ ]" is now a "formality" and so the Commission does not have any effective way to penalize race track owners, *i.e.*, "the power to fine" is "not much more effective than the power to revoke racing days." Sunset Report at 37. Accordingly, it suggested:

> *The General Assembly should more adequately define standards of conduct for track owners and establish a system of monetary penalties which may be assessed.*

*Id.* at 38. (emphasis in original).

This recommendation was *not* made with regard to fines imposed on general licensees. Rather, the Department of Fiscal Services after noting that the Racing Commission also regulates "those involved in the conduct of racing," and that included in this class of "general licensees" are "horse owners, and trainers," commended the Commission's methods of disciplining those persons. *Id.*

> In addition to the commission's licensing function, it promulgates rules and regulations for the conduct of races, which are enforced on the tracks by stewards or judges, inspectors, and veterinarians. Although the composition of the general class of licensees has not changed significantly since the commission was established, regulation of this segment is increasingly complex. Most of the commission's disciplinary activity relates to this sector of the industry. *The commission has the ability to penalize rule violators, as well as revoke or suspend their licenses. These penalties are effective and employed on almost a daily basis.*

*Id.* (emphasis added). Thus, as recently as four years ago, the General Assembly was again specifically put on notice that (1) "most" of the Racing Commission's disciplinary actions concern those general licensees involved in the conduct of racing for which there is no statutory authorization to discipline, *e.g.*,

owners, like Lussier; (2) the Commission, in addition to revoking or suspending licenses, "has the *ability* " to penalize these general licensees in ways other than revoking or suspending their licenses; and (3) these "penalties are effective and employed on almost a daily basis." If the General Assembly did not intend to permit the Racing Commission to impose the fines on general licensees, it seems likely that, in the face of this notification, it would have amended the Act to so provide. This seems particularly clear in light of the fact that the General Assembly has not hesitated to prohibit the Commission from adopting certain regulations. See § 11–210(b).

In view of all this evidence, and given the purpose behind the Act, the broad grant of authority to the Racing Commission to regulate racing, and the need to protect the integrity of the sport, we conclude that the legislative grant of authority to regulate racing includes the power to fine those general licensees who violate the Racing Commission's regulations. If we were to follow Lussier's contrary view to its logical conclusion, because the enabling statute only permits the Commission to discipline those who hold race meetings, the Commission could never take any action against any owner, trainer, or jockey or other general licensee who violated a regulation. The Court of Appeals has repeatedly rejected such an interpretation, expressly holding that the Commission possesses the power to regulate owners, trainers, and jockeys, etc. even without express statutory authorization.

Lussier makes one additional argument with regard to the Commission's power to fine, *i.e.,* that the Commission "ignored its own standards" when fining him. The Commission, recognizing that its power to impose penalties can only be imposed pursuant to defined standards and guidelines, *see Investors Funding Corp.,* 270 Md. at 441–43, 312 A.2d 225, has promulgated regulations expressly containing such guidelines to govern its imposition of fines and other penalties. These regulations provide:

> (1) The Commission may deny a license to an applicant and may suspend or revoke a license if an applicant or licensee has violated an applicable provision of law, any

regulation adopted by the Commission, or any condition imposed by the Commission.

(2) Instead of, or in addition to, suspending a license, the Commission may impose a fine not exceeding $5,000.

(3) In determining the penalty to be imposed, the Commission *shall consider* the:

(a) *Seriousness* of the violation;

(b) *Harm* caused by the violation;

(c) *Good faith* or lack of good faith of the licensee; and

(d) *Licensing history* of the licensee.

*See* COMAR 01.10.01.10H(3) (emphasis added). These regulations are obviously modelled on the statute governing the imposition of fines on race course owners. *See* § 11–308(d) of the Business Regulations Article. They clearly provide adequate standards; even Lussier does not claim to the contrary.

As to his sole remaining contention, that the Commission "ignored" these regulations, the Commission is only required to consider the listed factors; it is not required to make written findings or findings on the record. *Compare* Md.Code (1984, 1991 Repl.Vol.), § 12–202(a)(2)(iv) of the Family Law Article (requiring a court that deviates from the child support guidelines to make a finding on the record or in writing to explain the deviation). Thus, it is sufficient if the record supports the conclusion that the Commission considered these factors. The Commission had before it abundant, albeit largely circumstantial, evidence of Lussier's transgressions. *See infra* (iii). Moreover, there was evidence that Lussier had been licensed by the Commission during two of the races but that this license had expired.[7] Accordingly, if the Commission had not fined him, there was no possible remedy for those transgressions. It seems to us that this was certainly suffi-

---

**7.** Lussier obtained his license on December 29, 1991. A license, no matter when obtained, expires on December 31 of the year stamped on the application. COMAR 09.10.01.25C. Therefore, Lussier's license expired on December 31, 1991.

cient evidence upon which the Commission could have concluded that Lussier's actions merited a $5,000 fine.

(iii)

Lussier alleges that the Commission did not "effectively charge [him] with wrongdoing" and that its conclusions were not supported by substantial evidence "in light of the applicable burdens of proof."

The Commission sent Lussier a charge letter, dated May 5, 1992, in which it set forth the alleged occurrences and then charged him with violating several regulations, including CO-MAR 09.10.01.25B(8). That regulation provides:

The Commission may refuse to issue or renew a license or may suspend or revoke a license issued pursuant to this section if it finds that the applicant, or any person who is a partner, agent, employee, or associate of the applicant:

. . . .

(8) Has been guilty of or attempted any fraudulent or dishonest act in connection with his activities, responsibilities, or duties on the race track, or has engaged in conduct detrimental to racing.

Lussier contends that because he was not licensed or seeking licensure when he was charged, the sanctions provided in this regulation could not apply to him and so he would not be charged with violating it. There are several problems with this argument. First, while this regulation permits the Commission to suspend a license for any of the violations listed, it, of course, does not state that this is the only action that may be taken. Moreover, although Regulation 25B(8) does not expressly provide for a fine, other Racing Commission regulations provide *"[w]henever it appears ... that disciplinary or punitive action should be taken against any person for violation of the rules of racing ...,"* COMAR 09.10.-01.10A, (emphasis added), the Commission may impose a fine not exceeding $5,000." COMAR 09.10.01.10H. Thus, the regulations expressly permit the Commission to impose a fine

for any "violation of the rules of racing." The sort of attempted fraudulent or dishonest act prohibited by Regulation 25B(8) is clearly a violation of the rules of racing.

Lussier also asserts that there was insufficient evidence to support the findings of the Commission, because two of these findings involved fraud, which assertedly had to be, and was not, proven by clear and convincing evidence. In most civil judicial proceedings, the standard of proof is a preponderance of the evidence, and generally that standard is also applicable in administrative proceedings. *Everett v. Baltimore Gas & Elec. Co.*, 307 Md. 286, 301, 513 A.2d 882 (1986). In judicial proceedings, however, it is well established that allegations of fraud must be proved by the higher standard of clear and convincing evidence. *See id.* at 301–02, 513 A.2d 882. In 1986, the Court of Appeals held that in an administrative hearing, the Public Service Commission similarly had to prove by clear and convincing evidence its assertion that a customer committed fraud. *Id.* at 304, 513 A.2d 882. The Court explained that the "agency is to look to the standard of proof applied in civil cases to determine the standard to be applied in similar administrative proceedings." *Id.* at 303, 513 A.2d 882. In explaining its earlier decision in *Bernstein v. Real Estate Comm'n*, 221 Md. 221, 156 A.2d 657 (1960), which contained an arguably contrary directive, the Court noted that *Bernstein* was decided under the Administrative Procedure Act (APA), and so was of "questionable value" in a case, like *Everett*, where the agency was not subject to the APA. 307 Md. at 303, 513 A.2d 882. In the case at hand, of course, like *Bernstein* and unlike *Everett*, the agency was subject to the APA. Moreover, the General Assembly recently amended the APA to provide:

> The standard of proof in a contested case shall be the preponderance of the evidence unless the standard of clear and convincing evidence is imposed on the agency by regulation, statute, or constitution.

1993 Md.Laws, chap. 59 § 1; Md.Code (1984, 1993 Cum. Supp.), § 10–217 of the State Government Article. That

amendment is not directly applicable to the hearing at issue here, which was held prior to the amendment's June 1, 1993 effective date. *See* 1993 Laws, chap. 59 § 6. This amendment may, however, indicate prior law in administrative hearings decided under the APA.

■ In any event, we need not resolve this issue here because, as the Commission expressly found, there was clear and convincing evidence to support the Racing Commission's conclusions. That evidence was that within a five week period three first-time starters, for whom Lussier and Downing had been listed as owner and trainer when the horses were tattooed a few months earlier, were shipped to Maryland and raced under the name of a different owner or trainer. Each of the new owners or trainers was a relative unknown in the racing world, who was approached very shortly before the race by Lussier, Downing, or "Radio" Downing. Two of the horses, Perfect Reign and High Passer, were sold because of purported physical problems; yet Perfect Reign won her race and High Passer finished only one length behind the winner. Nevertheless, the horses were resold to Lussier immediately after their respective races. Moreover, even prior to Perfect Reign's "resale," Lussier stood prominently in the center of the winner's circle with the horse, while the horse's purported owner, Woodward Tuttle, stood off to the side.

With regard to the one horse, The Manager, for which Lussier did not arrange a quick—for Laurel only—sale and resale, Lussier hired an inexperienced groom as his trainer. The groom performed no training duties and was not paid the usual trainer's percentage of purse monies. Although Lussier claimed he hired the groom because his regular trainer, Michael Downing, was out of the country on a prepaid vacation, in fact Downing was at the race track when The Manager raced—and even bet on the horse.

In addition, although there was no evidence that Lussier, himself, contacted anyone to arrange the falsified workouts, or their publication in the *Daily Racing Form,* the Commission could reasonably infer Lussier's indirect involvement. This

inference could be drawn from the apparent knowledge of Lussier's trainer, Michael Downing, about the false workouts, *e.g.*, "The Manager never worked [out] at Delaware Park," and the fact that there was not one or two but three falsified reports, all of which were purportedly at Delaware Park, for each of Lussier's three horses. Finally, Lussier himself conceded that he came to Maryland and wagered heavily on all three horses, betting between $5,400 and $7,000 and winning over $30,000, even though he assertedly had *no* interest at race time in two of the horses.

On the basis of these facts and the others detailed at the outset of this opinion, the Commission certainly could have concluded that there was clear and convincing evidence that Lussier transferred a horse to the name of another person for a purpose "other than the legitimate sale of the horse" in violation of COMAR 09.10.01.11A(14), engaged in "improper acts in relation to racing" in violation of COMAR 09.10.01.-11A(3) and "perpetrat[ed] dishonest acts . . . and engaged in conduct detrimental to racing" in violation of COMAR 09.10.-01.25B.

Lussier's repeated and vehement assertions that the evidence adduced at the hearing was insufficient seems at its core to be rooted in his failure to recognize the probative value of circumstantial evidence. Even in the criminal context, where the standard of proof is more exacting, *i.e.*, "beyond a reasonable doubt" rather than just "clear and convincing," the force of circumstantial evidence is well recognized. As the Court of Appeals recently noted,

> Maryland has long held that there is no difference between direct and circumstantial evidence.
>
> . . . .
>
> [Even a criminal] conviction may be sustained on the basis of a single strand . . . or successive links of circumstantial evidence.

*Hebron v. State*, 331 Md. 219, 226, 228, 627 A.2d 1029 (1993). Here, to be sure, no witness confessed to any improper

behavior nor, as mentioned above, was there any direct link between Lussier and the false workouts. There was, however, some direct evidence and a veritable mountain of circumstantial evidence demonstrating Lussier's culpability. That was sufficient.

Lussier takes particular exception to (1) the Commission's characterization of the falsified workouts as "mediocre" and (2) the Commission's conclusion that he "effectively concealed from the betting public" the "true" owner or trainer of the horses and the "true speed of [the] horses." He maintains that there was no evidence as to whether the workouts were "mediocre" or who the "betting public" was or what it knew. Although there was no direct testimony on these points, the time of the workouts was listed on documents admitted into evidence and determination of whether those workout times were "mediocre" was certainly within the Racing Commission's expertise. Moreover, as noted within, one of the Commissioners specifically questioned Lussier as to why he had bet so heavily on Perfect Reign when Michael Downing had told Lussier the horse was not in good shape and when the horse had "no workouts that show anything of value." Lussier did not take issue with that characterization. Similarly, although there was no evidence as to the composition of the betting public or what it knew, the Racing Commission is the agency charged with regulating horse racing in order that it "may be conducted fairly, decently and cleanly." *Mahoney*, 187 Md. at 84, 48 A.2d 605. As such, it certainly had the experience, expertise, and ability to determine from the evidence adduced (*e.g.*, only false workouts were published, there was in each case a "for Laurel only" owner or trainer, and Lussier's own substantial wagering seemed to lower the odds) that relevant information, including the horses' true speed and owner or trainer, was concealed from the betting public.

Nor, contrary to Lussier's assertions, does the Commission's decision that there was insufficient evidence to find Marsh, Tuttle, and Wisecarver had violated Commission regulations somehow "buttress" the conclusion that Lussier was improperly found to violate those regulations. There was far

more evidence of Lussier's improper conduct than that of any of the others. For example, each of the others was involved with only one horse and there was no evidence that any of them bet any substantial amounts on that horse or greatly profited in any other way from their involvement with that horse. The Commission could well have concluded, as it maintains in its appellate brief, that the others were "autonomous in their respective endeavors with [Lussier] and unaware of his untoward objectives." There was, contrary to Lussier's suggestion, nothing that required the Commission to explain this in its written opinion.

In sum, Lussier was properly charged, and the Commission's findings that he violated three of its regulations were based on clear and convincing evidence.

### (iv)

Lussier attacks Regulations 11A(3) and 25B(8) as unconstitutionally vague on their face and as applied. Lussier asserts that the meaning of "[p]articipating in [an] improper act related to racing" and "conduct detrimental to racing" is unclear.

 A statute that "prohibits the doing of an act [framed] in terms so vague that persons of ordinary intelligence must necessarily guess at its meaning and differ as to its application violates the constitutional guaranty of due process of law." *Tidewater/Havre de Grace, Inc. v. Mayor & City Counsel of Havre de Grace*, 98 Md.App. 218, 228, 632 A.2d 509 (1993) (alteration in original) (quoting *Blum v. Engelman*, 190 Md. 109, 113, 57 A.2d 421 (1948)). That is, a statute must be sufficiently definite to provide notice of the conduct it prohibits or requires and to guide those who must apply it. *Boyce Motor Lines, Inc. v. United States*, 342 U.S. 337, 340, 72 S.Ct. 329, 330, 96 L.Ed. 367 (1952). Except for rare instances, the principle of vagueness is applicable only to criminal cases. *Maryland–Nat'l Capital Park & Planning Comm'n v. Mayor & City Council of Rockville*, 272 Md. 550, 559, 325 A.2d 748 (1974). It does however, apply to regulations that govern

commercial or economic activities if violations may result in a penalty, although the "fairness of a regulatory warning is governed by a less stringent standard in the absence of criminal penalties." *Lemberos v. Laurel Racecourse, Inc.*, 489 F.Supp. 1376, 1388 (D.Md.1980) (quoting *Diebold, Inc. v. Marshall*, 585 F.2d 1327, 1337 (6th Cir.1978)); *Lewitus v. Colwell*, 479 F.Supp. 439, 443 (D.Md.1979) (reviewing Regulation 25B). Regulations concerning commercial activities also require less specificity than statutes prohibiting criminal activities because any other rule would restrict the ability of agencies to respond to the variety of situations, sometimes unforeseen, with which they must deal. *Id.* at 1389.

■ Horse racing is an activity that invites attempts to circumvent proper procedures in order to gain some advantage. The Racing Commission cannot anticipate every situation that may arise. The phrase "conduct detrimental to racing" simply takes into account the wide variety of actions that may be taken that in some way compromise the integrity of racing. *See Hadges v. Corbisiero*, 739 F.Supp. 792 (S.D.N.Y.1989). A person of ordinary intelligence is not left to guess whether obscuring the identity of a horse's owner or trainer and information regarding a horse's past performance and then placing large bets on the horse are "improper" activities under the Racing Commission regulations. *See Lemberos*, 489 F.Supp. at 1389; *Lewitus*, 479 F.Supp. at 444.

(v)

Lussier's final argument involves a notice to appear and subpoena mailed to him in Vermont by the racing stewards and the Commission. On March 15, 1992, the stewards mailed to Lussier a notice to appear before them to answer certain charges. He did not appear and the stewards referred the matter to the Commission for a *de novo* hearing. On May 5, 1992, the Commission sent Lussier the charge letter and a subpoena that summoned him to appear before the Commission on May 27, 1992, later postponed to July 1, 1992. In a "Consent Order and Partial Settlement," Lussier agreed to appear voluntarily at the Commission hearing, although he

still objected to the legality of the subpoena sent to him in Vermont. In return, the Commission agreed that Perfect Reign and High Passer would be removed from the Stewards' List.

 Lussier's claim as to the stewards' notice, *i.e.,* that it was an improper subpoena to appear at an interrogation rather than a true investigatory hearing, is moot. Lussier never appeared at the stewards' hearing, and the matter was referred to the Commission for *de novo* review. Lussier's related argument as to the illegality of the enforcement of the Commission's subpoena has been waived. The Commission "may issue a subpoena for the attendance of a witness to testify or to produce evidence." § 11–211(e) (formerly Art. 78B § 11(e)). The Commission concedes that it could not have enforced the subpoena out of state, however, Lussier waived any complaint he may have had as to enforcement of the Commission's subpoena by appearing at the hearing. *Cf. Caucus Distrib., Inc. v. Maryland Sec. Comm'n,* 320 Md. 313, 337, 577 A.2d 783 (1990) (a party's general appearance at an administrative hearing waived any objections the party had to improper service of process).

JUDGMENT AFFIRMED.

APPELLANT TO PAY COSTS.