**Charles F. CRISSMAN, Jr., and Melvin Wayne Givens, Appellants Below, Appellants,**

v.

**DELAWARE HARNESS RACING COMMISSION, Appellee Below, Appellee.**

**No. 41/42, 2001.**

Supreme Court of Delaware.

Submitted: Nov. 27, 2001.
Decided: Feb. 22, 2002.

---

**5.** *Hechinger v. State,* 707 A.2d 766, 1998 WL 138932 (Del.Supr.)

Constantine F. Malmberg, III, Esquire, of Young & Malmberg, P.A., Dover, Delaware, for Appellant Crissman. Rebecca Batson Kidner, Esquire, of Rebecca Batson Kidner, P.A., Dover, Delaware, for Appellant Givens.

John A. Eberly, Esquire, of the Department of Justice, Wilmington, Delaware, for Appellee.

Before VEASEY, Chief Justice, WALSH and BERGER, Justices.

PER CURIAM.

In this appeal, we consider the constitutionality of Delaware Harness Racing Rules prohibiting "improper conduct" and conduct that may "adversely reflect on the honesty and integrity of horse racing." Two horsemen were sanctioned for secretly taping a conversation with a Commission official in an effort to obtain incriminating evidence from him. We conclude that the Commission rules are unconstitutionally vague, as applied, because they do not give fair notice that they prohibit the conduct at issue.

Factual and Procedural Background

In October 1997, after a Commission investigation and hearing, Charles F. Crissman, Jr., a horseman, learned that he had been excluded from racing at Dover Downs. Crissman thought that the State Steward, Harold W. Frazier, was the source of his problems, so Crissman met with Frazier in early November to discuss the matter. Frazier told Crissman that the Commission investigator, Robert Collison, was the man who was making trouble for Crissman. Frazier said that Collison was giving him problems, too. According to Crissman, Frazier then suggested that Collison should be murdered.

Crissman thought that Frazier was serious about wanting Collison dead, so Crissman sought advice from two other horsemen—Melvin Wayne Givens, Director of the Delaware Standardbred Owners Association, and Salvatore DiMario, Executive Director of the Association. One or both men suggested that Crissman should try to get Frazier to repeat his statement on tape. The three thought that Frazier would lose his job if the murder solicitation could be proven. As it happened, Givens had a tape recorder in his truck, so Crissman concealed it under his clothes and went back to see Frazier.

During the second conversation, Crissman tried to get back to the subject of murdering Collison by asking if Frazier knew how much it would cost and if Frazier wanted Collison to die slowly or quickly. The quality of the recording was very poor, however, and to the extent that Frazier's responses could be deciphered, they were inconclusive. As soon as Crissman left the meeting with Frazier, he gave the

tape to Givens, who gave it to his brother, Mark Givens, a retired State Police officer who worked in the Commission's licensing office.

Mark Givens gave the tape to Collison, who turned it over to the Attorney General's Office. The alleged murder solicitation was investigated by the Delaware State Police, but no charges were filed. After the police investigation concluded, Collison filed a complaint with the Commission against Frazier. The Commission held a hearing and issued a letter of reprimand to Frazier.

In July 1998, Crissman wrote a letter to the Commission in which he apologized for his participation in the taping of Frazier. Crissman's letter precipitated a Commission complaint against Crissman, Givens and DiMario. After a hearing, the Commission dismissed the charges against DiMario. The Commission held that Crissman and Givens violated two rules by attempting to get incriminating statements from Frazier. The two men were suspended for 90 days and fined $500.00. The Superior Court affirmed the decision of the Commission and this appeal followed.

## Discussion

■ The challenged Commission rules provide, in relevant part:

The Commission or its designee may . . . suspend or revoke a license issued, or may order disciplinary measures, if the applicant: is a person whose conduct or reputation may adversely reflect on the honesty and integrity of horse racing or interfere with the orderly conduct of a race meeting.[1]

No licensee shall use improper language to any race official, or be guilty of any improper conduct toward such officials. . ., such improper language or conduct having reference to the administration of the course, or of any race.[2]

The Commission found that Crissman violated those rules "[b]y secretly recording a conversation with State Steward Harold Frazier, during which [Crissman] attempted to elicit incriminating statements from Frazier, for the purpose of discrediting Frazier and causing his removal as State Steward, and then delivering the recording to respondent Wayne Givens...." The Commission held that Givens acted with the same motive and violated the same two rules by encouraging Crissman to make the tape recording, and then giving the tape to Mark Givens.

■ A statute or rule that "imposes a standard of conduct for the breach of which an individual will be held responsible must define the conduct with sufficient particularity to enable [the person] to make his [or her] conduct conform."[3] Stated another way, "a statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application violates the first essential of due process of law."[4] Courts review a constitutional vagueness challenge "as it applies to the [challenger's] own conduct."[5] Thus, the question is whether Crissman and Givens should have known that secretly tape re-

---

1. Delaware Harness Racing Commission Rule V.I.P.1(j) (the "integrity rule").

2. Delaware Harness Racing Commission Rule V.I.AA.1 (the "improper conduct rule").

3. *Globe Liquor Co. v. Four Roses Distillers Company,* 281 A.2d 19, 22 (Del.1971).

4. *Connally v. General Construction Co.,* 269 U.S. 385, 391, 46 S.Ct. 126, 70 L.Ed. 322 (1926).

5. *Pauls v. State,* 1989 WL 8105, **2 (Del. Supr.).

cording Frazier in order to discredit him would violate the integrity and improper conduct rules.

The Commission argues that its rules are similar to harness racing rules in other jurisdictions that have withstood constitutional vagueness challenges. In *LeRoy v. Illinois Racing Board*,[6] for example, the court upheld a rule that prohibited "improper language" and "improper conduct" by licensees. But the *LeRoy* court did not endorse all possible applications of the rule. LeRoy, who was sanctioned for using profanity and threatening a racing official, did not claim "that his own conduct lay outside the bounds of a properly drawn prohibition,"[7] and the court refused to consider "[w]hatever deficiencies [the rule] may display in application to others...."[8] In the same vein, a Maryland court analyzing a rule prohibiting "improper act[s] relating to racing" found the rule constitutional as applied:

> A person of ordinary intelligence is not left to guess whether obscuring the identity of a horse's owner or trainer and information regarding a horse's past performance and then placing large bets on the horse are "improper" activities under the Racing Commission regulations.[9]

A Pennsylvania court used the same analysis in upholding a rule allowing the racing association to exclude those whose presence would be "detrimental to the best interests of racing":

> We believe that a person of ordinary intelligence has adequate notice that the presence of a [jockey] who has been indicted for race-fixing would be "detrimental to the best interests of racing",

"a sport where the greatest importance should attach to dissipating any cloud of association with the undesirable, and in which the appearance as well as the fact of complete integrity is of paramount consideration...."[10]

■ The holdings in other states confirm that the Commission rules must be evaluated in context. Thus, even if the language of the rules may appear vague or overbroad, they will be upheld when applied to conduct that a reasonable person should have known was prohibited. In this case, Crissman and Givens did not use profanity, and they did not cheat, lie, or threaten anyone. Crissman was having a private conversation with Frazier when, without any prompting, Frazier suggested that another Commission official should be murdered. Crissman discussed with Givens how he should respond to what might have been criminal conduct on the part of a high ranking Commission official, and they decided to try to get Frazier to repeat himself on tape. Givens gave the tape to his brother, a former police officer and Commission employee, who passed it along to the Commission investigator.

In sum, Crissman and Givens dealt with a difficult and unusual situation in a lawful manner that they deemed appropriate. They did not start a whispering campaign against Frazier or otherwise malign him. Rather, they collected evidence and turned that evidence over to a former police officer who was employed by the Commission. We are not unmindful of the Commission's findings that Crissman and Givens acted out of selfish motives, but that is not the issue. The issue is whether an ordinary person should have known that what

**6.** 39 F.3d 711 (7th Cir.1994).

**7.** *Id.* at 715.

**8.** *Ibid.*

**9.** *Lussier v. Maryland Racing Commission,* 100 Md.App. 190, 640 A.2d 259, 274 (1994).

**10.** *Daly v. Commonwealth,* 38 Pa.Cmwlth. 77, 391 A.2d 1134, 1136 (1978) (Citations omitted.)

Crissman and Givens did would violate the integrity and improper conduct rules. We think not. Frazier is the person whose conduct, as alleged, was improper and adversely reflected on the integrity of horse racing. Crissman and Givens reacted with a reasonable course of conduct that they had no reason to know would run afoul of the improper conduct and integrity rules.

### Conclusion

Based on the foregoing, we hold that the integrity rule and the improper conduct rule are unconstitutional as applied to the facts of this case. The decision of the Superior Court is reversed.